UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| STEVE OGLESBY PRODUCTIONS, INC. )<br>d/b/a OGLESBY DIGITAL POST and, )<br>HOWARD S. and PATRICIA J. )<br>OGLESBY, )<br>      Plaintiffs, )<br>)    3:04-cv-0173-RLY-WGH<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>      Defendant. | |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Howard and Patricia Oglesby, are the sole shareholders of Plaintiff, Steve Oglesby Productions, Inc. d/b/a Oglesby Digital Post.[1]  For the year 1995, Plaintiffs claimed a non-monetary charitable deduction valued at $204,000 for the use of stock video footage they say is owned by Steve Oglesby, or the corporation, in a video Oglesby produced for Habitat for Humanity.  Because of single year limitations on charitable deductions and Internal Revenue Code provisions which allow the carryover of large charitable deductions, the deduction was claimed at $51,000 per year for the years 1995 through 1998.  The IRS audited the Plaintiffs' tax returns and disallowed the deduction for the alleged charitable contribution.  As a result of the audit, Howard and Patricia

---

[1] Pursuant to "flow through" rules, any income tax obligation of Steve Oglesby Productions, Inc., as an "S" corporation, is reportable on the individual income tax return of Howard and Patricia Oglesby.

Oglesby paid deficiencies, penalties and interest.  They seek a refund, through this lawsuit, of $6,219.00 for 1998, $13,451.00 for 1997, $12,907.00 for 1996 and $13,656.00 for 1995.

The government has filed a motion seeking summary judgment in its favor, arguing that the IRS properly disallowed the $204,000 charitable deduction and that even if a question of fact remains with respect to that issue, pursuant to 26 U.S.C. § 6511, Plaintiffs' refund claim for the year 1996 is entirely untimely and the 1995 claim must be limited to $11,349.83.  Plaintiffs argue that their refund claim is timely and that they have adequately substantiated their contention that they are entitled to the $204,000.00 charitable deduction.[2]

---

[2] Though both sides have submitted designations of what they assert are undisputed material facts, in so doing the Plaintiffs did not adhere to Local Rule 56.1, which requires a "Statement of Material Facts in Dispute" from the non-moving party.  In other words, by requiring that the moving party set out what material facts it believes to be undisputed and then requiring the non-moving party to respond by setting forth what facts are disputed and referencing that part of the evidentiary record that evidences the dispute, the Local Rule attempts to help the parties and the court focus their attention on any factual issues which may remain unresolved so that the materiality of those factual discrepancies can be addressed.  That did not happen here because Plaintiffs simply submitted what facts they felt were undisputed, not what facts are material and in dispute.  According to Local Rule 56.1, the failure of the non-moving party to contest the undisputed facts set forth by the moving party leads to the facts as alleged by the moving party being deemed admitted.  While practically speaking it does not appear that the facts are in dispute, without a submission from Plaintiffs challenging specific facts set forth by the United States, the court has relied on the facts set forth by the United States, pursuant to Local Rule 56.1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is only to be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir. 2001). It also draws all reasonable inferences in favor of and views the disputed evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather he must go beyond the pleadings and support his contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Only competing evidence regarding facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). And, if the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment is properly granted to the moving party. *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

**FACTUAL BACKGROUND**

In 1992 one of Steve Oglesby's clients asked if he would become involved in the Habitat for Humanity charitable efforts in Evansville. The organization was planning a "Blitz" wherein local volunteers would attempt to build a large number of houses in a single week. This type of effort was the result of friendly competition between local branches of the national organization. Oglesby stepped in and helped put together a very short promotional video for that 1992 building effort. That first short video is not at issue in this case. The video that is at issue here resulted from later activities in 1992.

Oglesby and numerous other experienced media volunteers from the greater Evansville area took turns video taping different aspects of the week long Blitz in 1992. Video was taken of the houses being built, an aerial view was shot from a local hospital's helicopter and some footage of the charity's founders and leaders was also taped. Twenty-one homes were constructed in five days. Oglesby donated some of the raw video tapes utilized and also allowed some of the videographers to utilize his company's cameras. The video tape shot by the various volunteers in 1992 was gathered and turned over to Oglesby who had volunteered to donate his post production digital editing skills to put together a final promotional product of some sort for the charity. What that end product would actually look like or the purpose it would serve was not decided at the time. None of the media volunteers were compensated in any way for their work in 1992 and they all volunteered (or were volunteered by their employers) with the notion that

some type of video documenting this "Blitz" would be the end product of their efforts. As stated by Tim Truelove, one of the media volunteers, "[t]he atmosphere of the 1992 Blitz was one of goodwill and cooperation. People would help out when and where they were needed." And, as Steve Oglesby testified, the video volunteers were part of a team and "a secondary resource to Habitat", with the contractors being the primary resource.

Nothing immediately came of the video tapes shot during the 1992 Blitz. As time passed, Oglesby became more involved in the media committee for the local Habitat for Humanity group. He held on to and stored the video tapes that had been shot in 1992. Some time not too long after the 1992 Blitz, another Habitat for Humanity group from another locality beat the record number of houses that had been built in 1992 in Evansville. So, in 1994 the Evansville group planned to regain the record through another Blitz in 1995.

Oglesby was approached about putting together a promotional video for the upcoming 1995 Blitz. He created such a video by utilizing portions of the 1992 videos and additional video he shot in 1994 of community leaders discussing the 1992 Blitz and Habitat for Humanity efforts in general. The video was about eight or nine minutes long and utilized by the charity's leadership to introduce meetings at churches and other community locations where attempts were being made to solicit contributions for, and develop interest in, the 1995 Blitz. He also created a short public service announcement ("PSA") to be used to promote the 1995 Blitz.

This eight to nine minute video is described by Oglesby as a "stream of consciousness" piece that derives its theme from "the words that Jesus used when he was describing how you should treat people." Oglesby says he utilized 85 individual "shots" or "clips" from the 1992 Blitz video tapes taken by other volunteer videographers in creating the video and the PSA. Oglesby defined an individual "shot" in his deposition by stating that "every time a scene changes is another shot." He says that a "clip" means the same thing as a "shot." In his deposition, Oglesby testified that his records indicate there were a total of 914 different shots in the video he created and that sometimes he might put eight shots into ten seconds of video and in other instances single shots may last for more than ten seconds.

Beginning in 1994, according to Plaintiffs' Complaint, Plaintiffs took charitable deductions on their tax returns for finished product videos donated to Habitat for Humanity. As best as can be determined from the record, on the 1995 tax returns for Oglesby Digital Post, a charitable deduction was taken for $204,000, representing the value of the licensing rights for the use of the shots which had not been originally videotaped by Oglesby in the final product videos donated to Habitat for Humanity. According to Oglesby, based on information obtained from a "stock footage" distribution company his company had used in the past, a fair price for the license rights for one year's use of a stock footage clip or shot, in a manner similar to how Habitat for Humanity used the video he created, is $600 per shot per year. While Oglesby testified in

deposition that the deduction represented a "buy-out" of the license rights, it is unclear from the record what he meant by that term or why the "buy-out" is also equal to four times the yearly license fee Plaintiffs assert is an appropriate value for use of what Oglesby is calling 85 shots from "stock footage."[3] In any event, the record indicates that the total of the deduction was $204,000 which, via carry-over provisions, was deducted over the course of Plaintiffs' tax returns for the 1995, 1996, 1997 and 1998 calendar years.

     Not surprisingly, Plaintiffs' 1994 and 1995 tax returns were audited and questions were raised with respect to the 1995 charitable deduction for stock footage, resulting in the IRS disallowing the claimed deduction. The Plaintiffs' 1995 tax return was received by the IRS on September 3, 1996. Payments on the 1995 tax liability were made in the amounts of $7,202.00, $9,800.00, and $11,349.83 on April 15, 1996, January 14, 1998, and January 3, 2000, respectively. Plaintiffs filed their claim for refund in the form of an amended tax return on March 2, 2001. The 1996 return was received by the IRS on October 20, 1997. Payments on that year's liability were made in the amounts of $5,612.00, $17,208.00 and $408.59 on April 15, 1997, October 20, 1997, and December 5, 1997, respectively. In effect, this lawsuit seeks to have the disallowance of the

---

[3]In fact, because Oglesby testifies in deposition that he considered a number of different things in coming up with what he believed was a fair value for use of the 1992 "shots" and because the questioning attorney allowed Oglesby to testify in lengthy narrative fashion instead of answering specific questions, it is difficult to determine exactly how Plaintiffs arrived at the amount of the deduction claimed.

$204,000 charitable deduction reversed and a refund issued to the Plaintiffs in the amount of $6,219.00 for 1998, $13,451.00 for 1997, $12,907.00 for 1996 and $13,656.00 for 1995.

## DISCUSSION

The United States first challenges the timeliness of the claim for refund on the 1996 return and all but $11,349.83 of the refund claim on the 1995 return. It does so because 26 U.S.C. § 6511(a) requires that a claim for refund be filed "within three years from the time the return was filed or two years from the time the tax was paid, whichever of such periods expires later," and § 6511(b)(2)(B) limits the amount of recovery on a timely claim for refund to any amounts paid within the two years immediately preceding the filing of the refund claim. Based upon the dates of payment and the dates of the refund requests with respect to 1995 and 1996, the government asserts its timeliness bar.

Plaintiffs argue that the amounts paid in January of 1998 and 2000, after the audit of their returns began, were deposits made to stop the running of underpayment interest as opposed to payments on assessed tax liability. They maintain that not until final assessment by the Appeals Officer in 2001 did the deposits actually become payments. In support of their argument they cite to a revenue procedure bulletin issued in 1984, Rev. Proc. 84-58 (since superceded by Rev. Proc. 05-18) and *Rosenman v. United States*, 323 U.S. 658 (1945).

-8-

The United States does not take issue with the fact that *Rosenman* clarifies that there can be a distinction between "deposits' made to forestall interest or penalties and "payments" made on tax liability, but rightfully points back to Section 4 of Rev. Proc. 84-58 to note that there is a requirement that a taxpayer specifically designate a remittance as a "deposit in the nature of a cash bond" if the remittance is to be treated as being on deposit. Plaintiffs have provided no evidence that any such designation was made by them. Accordingly, the service's treatment of the amounts payed as payment on tax liability was appropriate and the government's argument with regard to timeliness has merit as well.

Plaintiffs filed their 1995 return on September 30, 1996. Their claim for refund was filed on or after March 2, 2001. Thus, the claim was not filed within three years of the date the return was filed and the two year limitation applies. Two years before the filing of their claim was March 2, 1999. Only the $11,349.83 payment made on the 1995 tax liability on January 3, 2000, falls within the two year period prescribed in § 6511(b)(2)(B). Thus, if any recovery can be made with respect to a refund on their 1995 taxes, it is limited to $11,349.83.

For 1996, plaintiffs filed their return on or before November 17, 1997, more than three years before they filed their refund claim on March 2, 2001. None of the payments made on that year's liability falls within the two year window set forth in § 6511(b)(2)(B). Thus, Plaintiffs are not entitled to recover any of these amounts even if

-9-

they were to prevail on the issue of deductibility. And, they do not prevail on that issue either.

In order for Plaintiffs to appropriately claim the type of deduction they argue is applicable to the use of stock footage in the video created and donated by Oglesby, they would have to own the video tapes containing the stock footage shot by the various media volunteers in 1992. Plaintiffs admit as much in their brief and argue that Oglesby exchanged the use of camera equipment and raw tape for the stock footage. That is certainly not what any of the volunteer media professionals set forth in their affidavits. Nor is it what Steve Oglesby testified to in his deposition.

It is abundantly clear from the record that the media volunteers agreed to shoot footage of the 1992 Blitz for the benefit of Habitat for Humanity and at the conclusion of their work they provided the tapes to Oglesby as a caretaker. They all believed Oglesby would eventually take what they shot and, through his editing skills, turn it into something of value for Habitat for Humanity. In fact, Oglesby testified at his deposition that he really didn't think he owned the tapes, he was simply keeping them under his roof because everyone anticipated that at some point the tapes would be used for the benefit of Habitat for Humanity. Any attempt to change that testimony and create a question of fact through the submission of a subsequent affidavit is rejected as wholly unreliable. *See Bank of Illinois v. Allied Signal Safety Restrain Systems*, 75 F.3d1162, 1168-69 (7th Cir. 1996). The tapes were created for and had value specific to Habitat for Humanity. The

fact that Habitat for Humanity officers never went to Oglesby and asked him for the tapes does not grant ownership to Oglesby by default.

This court needs to go no further with its analysis than to decide that Plaintiffs did not own what they are calling the "stock footage" and therefore can not claim a deduction related to its use. However, it would be remiss if it did not point out that there is another obvious flaw in Plaintiffs' attempt to claim a deduction for elements used in the course of creating an artistic work, such as the video or PSA. According to Oglesby, there were 914 individual shots used in the video alone. Oglesby, and no one else, controlled the number of stock footage shots to include. If in the course of his artistic expression, he chose to use 850 shots from the thousands of shots contained in the 1992 footage shot by others, instead of 85, then under Plaintiffs' theory of valuation they would have been entitled to a charitable deduction somewhere in the neighborhood of $2,040,000.00. That is preposterous. In short, it would make no sense if Oglesby could control the value that his company could claim as a charitable deduction through the exercise of his artistic discretion, that being his determination of what video elements would become part of the final video product.

## CONCLUSION

For the reasons discussed in this entry, the United States' Motion for Summary Judgment (Document #29) is **GRANTED**. A separate judgment in favor of the United

States on Plaintiff's Complaint will issue forthwith.

        IT IS SO ORDERED, this  25th day of August 2006.

                                        _____
                                        RICHARD L. YOUNG, JUDGE
                                        United States District Court
                                        Southern District of Indiana

Electronic Copies to:
Kevin Peter Jenkins
U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
kevin.p.jenkins@usdoj.gov

Adria S. Price
PRICE & ASSOCIATES, LLC
adria@pricelaw.net

Stephen Alfred Sherman
U.S. DEPARTMENT OF JUSTICE
stephen.A.Sherman@usdoj.gov

Karen Ann Smith
U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
karen.a.smith@usdoj.gov